IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RHONDA M., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 1:24CV698 |
| FRANK BISIGNANO, Commissioner of Social Security,[1] | ) ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Rhonda M. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on February 28, 2022, alleging a disability onset date of July 1, 2021. (Tr. at 46, 205-18.)[2] Plaintiff's applications were denied

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

initially (Tr. at 98-115, 134-43) and upon reconsideration (Tr. at 116-33, 144-55). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 156-58.) On September 6, 2023, Plaintiff, along with her attorney representative, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 46, 70-97.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 63), and on June 6, 2024, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 21-27).

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the [claimant] is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date, July 1, 2021. (Tr. at 48.) The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 48-49.) At step two, the ALJ further determined that Plaintiff suffered from two severe impairments,

> blepharospasm of the bilateral eyes and eyelid apraxia[.]

(Tr. at 49.) The ALJ also identified multiple additional impairments as nonsevere. (Tr. at 49-52.) The ALJ found at step three that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing. (Tr. at 52.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, as of her date last insured, she could perform a full range of work at all exertional levels, but with the following, nonexertional limitations:

> [Plaintiff] cannot work at unprotected heights or around other significant workplace hazards. She cannot perform tasks that require precise near acuity

such as threading a needle or reading fine print. She is expected to be off-task approximately 10% of the workday in addition to normal breaks. She cannot operate automotive or heavy equipment as part of the job.

(Tr. at 52.) At step four of the analysis, the ALJ found, based on the vocational expert's testimony, that all of Plaintiff's past relevant work exceeded her RFC. (Tr. at 59-60.) However, the ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 61-63.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 63.)

Plaintiff now raises three challenges to the ALJ's decision. Specifically, Plaintiff contends that the ALJ erred in (1) finding that "Plaintiff had no visual limitations related to her medically established photophobia," (2) "fail[ing] to adequately support his finding that Plaintiff would be off task approximately 10% of the workday," and (3) rejecting the statements provided by Plaintiff's mother because she is related to Plaintiff and "does not have medical training." (Pl.'s Br. [Doc. #8] at 4.) After a thorough review of the record, the Court finds that none of Plaintiff's contentions require remand.

A. Photophobia

Plaintiff first alleges that, despite finding that photophobia, i.e. light-induced eye sensitivity and pain, was one of the primary symptoms of Plaintiff's visual impairments, the ALJ included no RFC limitations to account for this sensitivity. Instead, Plaintiff contends that the RFC only contains visual limitations related to acuity. Therefore, Plaintiff contends that substantial evidence fails to support the RFC as written. (Pl.'s Br. at 7.)

However, the ALJ's decision specifically addressed Plaintiff's light sensitivity both in addressing her impairments and in setting the RFC. First, the ALJ noted that Plaintiff "alleges a combination of impairments affecting her eyes" that "cause severe involuntary spasms, pain, headaches, and marked sensitivity to light." (Tr. at 53.) The ALJ also noted Plaintiff's testimony that her spasms and pain spells forced her to keep her eyes shut for extended periods, and that "[s]he still wore special sunglasses at all times." (Tr. at 54.) The ALJ then reviewed the medical evidence, including notes of "increased light sensitivity" and photophobia "consistent with a diagnosis of blepharospasm," noting her doctor's explanation that "people with blepharospasm often complain of overlapping eye pain and photodynia (light-induced eye pain)". (Tr. at 55.) The ALJ summarized subsequent treatment records noting "light sensitivity again," and a recommendation for "simple sunglasses." (Tr. at 55.) The consultative examiner, Dr. James Branch, likewise noted Plaintiff's history of light sensitivity and "recommended tinted sunglasses." (Tr. at 56.) The ALJ also noted that on review of the medical record, Plaintiff had "unremarkable physical exams" with "no mention of her being in a visible state of eye spasm or ptosis", "no mention that she appeared uncomfortable or avoidant of light", "no mention of sunglasses", and "[s]he did not ask that the light be turned down." (Tr. at 57.) The ALJ then found that:

> A comprehensive review of the exams and impressions from primary care, multiple specialists, and the consulting examiner all support additional limitations on precise near acuity and <u>a modest off task requirement</u>. This accounts for many of the claimant's stated concerns about periods with having to <u>rest her eyes unexpectedly or having to avoid lights</u>, balanced against her actual presentation on exam, her visual exams results, her treatment plans, and her admitted daily activities.

(Tr. at 58 (emphasis added).) In setting the RFC, the ALJ included a 10% time off task limitation, and in evaluating the availability of other work, the ALJ noted that available work:

> would remain in these numbers even if she were off-task approximately 10% of each workday in addition to her normally scheduled breaks. This easily accounts for the claimant's reports of increased eye spasm, headaches, and <u>increased sensitivity to light,</u> to the extent those are consistent with and supported by the examining and treating evidence discussed above.

(Tr. at 62 (emphasis added).) Thus, the ALJ repeatedly noted and considered Plaintiff's sensitivity to light and specifically found that the allowance for 10% time off task would allow her time to address any light sensitivity.

The ALJ further noted that the consulting ophthalmologist, Dr. Branch, recommended that Plaintiff wear tinted sunglasses to address her light sensitivity (Tr. at 56), and Plaintiff testified at her hearing that she "wore special sunglasses at all times." (Tr. at 54, 82.) Further, the ALJ also noted Plaintiff's "improved functioning with sunglasses." (Tr. at 59.) Notably, Plaintiff's own attorney expressly questioned the vocational expert regarding the impact of this requirement, along with other visual requirements, on Plaintiff's ability to work, and the expert testified that the "wearing of reading glasses and/or sunglasses indoors would have no effect on the occupational bases for the jobs described." (Tr. at 62):

> Q     What about issues with . . . light sensitivity and the worker needs essentially prescription dark sunglasses, how would that impact one's ability to do cleaner jobs?
>
> A     Well, are you say[ing] prescription sunglass[es]? In they have prescription sunglasses or reader sunglasses, then they would be able to perform the job. Just because they have the sunblock does not preclude the ability to do the jobs.

(Tr. at 92-93.) This issue was then specifically addressed by the ALJ in determining the availability of other work, because at step five the ALJ specifically noted that "[t]he expert said

8

that wearing of reading glasses and/or sunglasses indoors would have no effect on the occupational base for the jobs described." (Tr. at 62.)

Thus, Plaintiff's first contention, that the ALJ failed to include any "work limitations to account for Plaintiff's photophobia" (Pl.'s Br. at 7), does not provide a basis for remand, given that (1) the ALJ's discussion of the evidence specifically included Plaintiff's photophobia, (2) the ALJ included a time off-task limitation in the RFC and specifically noted that this limitation was included to address Plaintiff's light sensitivity; and (3) the ALJ also explicitly relied on specific questioning of the vocational expert regarding the impact of Plaintiff's need for sunglasses to address her photophobia. The ALJ rejected Plaintiff's testimony that her impairments rendered her functionally blind outside of the darkest areas of her home, and Plaintiff does not challenge the ALJ's finding that Plaintiff's statements concerning the intensity and limiting effects of her symptoms are not fully supported by the objective medical evidence and other evidence of record. (Tr. at 54.)[5] The ALJ nevertheless accepted that Plaintiff's eye impairments caused various symptoms including photophobia,

---

[5] As explained in subsection C of this Opinion, the ALJ adequately described his reasons for rejecting the extreme limitations posited by Plaintiff and her mother, Ms. Virginia Smith, including Plaintiff's alleged "inability to tolerate even modestly bright environments." (Tr. at 59.) In making these findings, the ALJ emphasized that none of Plaintiff's treatment notes or other evidence corroborates the "highly remarkable appearance" Plaintiff described as taking during all public outings. (Tr. at 57, 62.) Specifically, Plaintiff described avoiding all lights, leaning back to see anything, and being unable to see "save through a fraction of a slit at the bottom of her glasses," yet none of Plaintiff's other providers, including Drs. Moser, Rice, or Anderson, recorded this behavior, "let alone endorse[d] it." (Tr. at 62.) The ALJ particularly noted that Plaintiff's primary care physician, Dr. Schultz, recorded unremarkable physical examinations, and that Dr. Schultz "knew of Plaintiff's vision and eyelid issues," but at Plaintiff's appointments,
> [t]here was no mention of her being in a visible state of eye spasm or ptosis. There was no mention that [Plaintiff] appeared uncomfortable or avoidant of the light. There was no mention of sunglasses. She did not ask that the light be turned down. She did not appear to be in pain. There was no mention of abnormal mental status or compromised concentration. There was no mention of a chaperone guiding her around. She was not described as having to tilt her head back to walk or move. Instead, she recalled her recent Botox injection, denied it was helping, and said she was anticipating getting on disability.

(Tr. at 57-58.)

9

and as discussed above, the ALJ specifically included a time off-task limitation to address these symptoms, and also confirmed the ability of Plaintiff to wear sunglasses, prescription or otherwise, to manage her symptoms with no effect on the occupational base.[6] The ALJ further supported his decision not to adopt more extreme limitations based on the conclusion that the RFC "is best supported by her collective vision exams and testing from the consulting examiner, her neurologist, and her ophthalmologists. Also most supportive are her relatively stable treatment plans, partial relief with Botox, improved functioning with sunglasses, her modest visual acuity decreases on testing, Dr. Anderson's gauging of her response to care, her providers' improving understanding of the nature and controllability of her impairments, and her admitted capacity for various activities of daily living." (Tr. at 59.) Plaintiff does not raise a challenge to this conclusion or the ALJ's consideration of the evidence, and substantial evidence supports the RFC as written.

B. Off-task percentage

Plaintiff next contends that the ALJ failed to adequately explain the basis for the 10% off-task limitation included in the RFC assessment. Where an ALJ renders a specific off task percentage as part of a claimant's RFC, the "ALJ must explain and support that conclusion with substantial evidence," just as he must sufficiently explain the basis for all RFC limitations. Berry v. Comm'r of Soc. Sec., No. 3:21-cv-00240-RJC, 2022 WL 3354778, at *2 (W.D.N.C. Aug. 12, 2022). Thus, "[m]any courts in the Fourth Circuit . . . require the ALJ to explain how

---

[6] The vocational expert also testified, in response to hypotheticals set out by Plaintiff's attorney, that an individual with the very limited range of vision described by Plaintiff, i.e., "seeing just a slit," would be able to perform the jobs identified at step five of the sequential analysis. (Tr. at 91-92.) Thus, the ALJ's omission of this behavior, as described by Plaintiff, would have no impact on the ultimate disability decision in any event.

10

he or she arrived at the off-task percentage." Id. (collecting cases) (finding that where the ALJ never discussed the percentage of time off task anywhere other than the conclusory determination, it was impossible for the court to determine whether the RFC was supported by substantial evidence); see also Keith L. v. Saul, No. DLB-20-930, 2021 WL 1723084, at *2 (D. Md. Apr. 30, 2021) ("Without a narrative explanation of how the evidence supports the ALJ's seemingly arbitrary conclusion that plaintiff would be off-task five percent of the workday, the Court cannot engage in meaningful substantial evidence review.").

Notably, the vast majority of cases involving time off task incorporate such a restriction to account for a claimant's mental limitations, most often a reduced ability to maintain attention, concentration, or pace, as a result of a mental impairment. See, e.g., Uribe v. Comm'r of Soc. Sec., No. 5:21-CV-160, 2023 WL 1868241 (W.D.N.C. Feb. 8, 2023); McNeely v. Saul, No. 2:20-cv-158, 2020 WL 5648214 (S.D.W. Va. Sept. 4, 2020); Richardson v. Saul, No. 4:19-CV-128-FL, 2020 WL 3816317 (E.D.N.C. Jun. 9, 2020); Conary v. Berryhill, No. 2:18-cv-01228, 2019 WL 3216041 (S.D.W. Va. Jun. 25, 2019); Patricia W. v. Berryhill, No. 1:19-cv-9, 2019 WL 6790512 (D. Md. Dec. 12, 2019); Kennedy v. Berryhill, No. 3:18-cv-405-RJC, 2019 WL 3664936 (W.D.N.C. Aug. 6, 2019). By their very nature, these mental restrictions often defy exact quantification, as they seek to approximate the amount of time an individual's symptoms will distract her from work in the course of an 8-hour workday.

Further, the analysis differs when the ALJ finds that the Plaintiff would be off task "no more than" ten percent of the day, and includes sufficient explanation for concluding that Plaintiff's mental limitations were not disabling. Shaw v. Kijakazi, No. 1:20CV581, 2021 WL 3079905, at *9 (M.D.N.C. July 21, 2021) (finding no error where the ALJ found that the

11

Plaintiff "would be off task no more than ten percent of the time in an eight-hour workday" because "the ALJ found that [the p]laintiff's depressive disorder caused some limitation in [his] ability to remain on-task but not disabling limitations," given the vocational expert's testimony that time off-task up to ten percent was not work preclusive) (emphasis added and quotation marks omitted) (citing Link v. Saul, No. 1:19CV662, 2020 WL 5044038, at *9 (M.D.N.C. Aug. 26, 2020) (holding that the ALJ's findings at step two, the analysis of Plaintiff's subjective symptom reporting, and the evaluation of objective evidence "adequately explained the RFC's allowance for [the p]laintiff to remain off-task for up to 10 percent of the workday in addition to normal breaks"), recommendation adopted, slip op. (M.D.N.C. Sept. 10, 2020) (Biggs, J.)).

Moreover, where, as here, an off-task percentage stems from a primarily physical impairment, courts within this Circuit have found an exact percentage of time off task susceptible to review and supported by substantial evidence. In Painter v. Berryhill, No. 2:17-CV-04435, 2018 WL 5904510, at *11 (S.D.W. Va. Oct. 19, 2018), the ALJ included an additional five percent off task in the RFC finding to accommodate the need for one to two additional bathroom visits per day, in addition to normal breaks, due to the claimant's Crohn's Disease symptomology. Notably, the ALJ specifically relied on the claimant's hearing testimony when making this finding. Id. In finding the ALJ's off-task finding supported by substantial evidence, the court held as follows:

> [C]ontrary to Claimant's representation that the basis for the ALJ's finding was unclear, a review of the record demonstrates that the ALJ's five percent figure was based entirely upon a reasonable estimate of the time that Claimant spent in the bathroom combined with the number of bathroom visits she typically made during her waking hours, taking into account her testimony, her reported activities, the medical information related to Crohn's disease, [her treating

12

provider's] statement, the number of hours in a workday, and the number of waking hours left in the day outside of work. When piecing this evidence together, the ALJ's conclusion that Claimant would require time for a total of four to five bowel movements while at work was imminently reasonable.

Id., 2018 WL 5904510, at *12.

A review of the record in the present case reveals that the ALJ sufficiently explained his basis for finding that Plaintiff "is expected to be off-task approximately 10% of the workday in addition to normal breaks." (Tr. at 52.) First, the ALJ noted Plaintiff's testimony that her eye "spasm and pain spells forced her to keep her eyes shut for extended periods" and her testimony that this "could last an hour or more several times a day." (Tr. at 54, 79-80.) However, she also testified that eye spasms last for ten seconds up to a minute, and occur two or three times a day. (Tr. at 79-80.) The ALJ then reviewed the medical record, and noted that in an ophthalmological consult with Dr. Rice:

> She reported more eye pain, photophobia, and eyelid drooping. She did not describe extreme pain or headaches rendering her incapacitated for up to an hour several times a day. Rather, she alleged spasms lasting for a couple of minutes for 4-5 times a day (totaling about 10-15 minutes of time).

(Tr. at 56.) Another record similarly noted her report that her "eyes sometimes seemed to close and she could not open them. (Tr. at 57.) When this happened she had to stop and wait for them to "reboot." (Tr. at 57.) She later saw Dr. Nathan Anderson, "an ophthalmologist specializing in oculoplastic surgery," and:

> [s]he did not describe extreme pain or headaches rendering her incapacitated for up to an hour several times a day. Rather, she alleged spasms lasting for a couple of minutes for 4-5 times a day (totaling about 10-15 minutes of time). These were worse on the right side than the left. He described her blepharospasm as "mild", rather than severe or intractable.

(Tr. at 57.) The ALJ also noted the joint source statement from Dr. Rice and Dr. Anderson, describing her problems as "episodic." (Tr. at 58.)

The ALJ concluded that "[c]onsistent with her claims about having to keep her eyes shut at times, she is expected to be off-task approximately 10% of the workday." (Tr. at 55.) The ALJ further explained that "[a] comprehensive review of the exams and impressions from primary care, multiple specialists, and the consultative examiner all support . . . a modest off task requirement. This accounts for many of the claimant's stated concerns about periods with having to rest her eyes unexpectedly or having to avoid lights, balanced against her actual presentation on exam, her visual exams results, her treatment plans, and her admitted daily activities." (Tr. at 58.)

Both the ALJ and Plaintiff's counsel presented numerous hypotheticals to the vocational expert regarding the effect of various limitations on Plaintiff's ability to work. In particular, Plaintiff's counsel engaged in the following exchange with the vocational expert:

> Q [N]othing I'd asked earlier was about the vision issue. I want to follow up on that. If a person had a period of time where they have no vision, and it's less than what [I] presented to you earlier, but it would occur randomly and approximately four times throughout the workday for up to – from ten seconds up to a minute. How would that impact her ability to do any of those jobs[?]
>
> A Okay and let me make sure I understand your hypothetical. You're saying that an individual would have up to four minutes per day where they could not see.
>
> Q And that would be random, yes.
>
> A Well, I think that would be taken into consideration for off-task behavior, and I don't think that would impact a person's ability to perform those jobs.

(Tr. at 93.)

To the extent Plaintiff reported additional symptoms that would increase her time off task, the ALJ found that an off-task allowance of approximately 10% per workday in addition to normally scheduled breaks "easily accounts for [Plaintiff's] reports of increased eye spasm, headaches, and increased sensitivity to light, to the extent those are consistent with and supported by the examining and treating evidence discussed above." (Tr. at 62.) The ALJ further discussed, at length, the potential impact of the hypotheticals presented by Plaintiff's counsel, again noting that these scenarios were overly reliant on Plaintiff's subjective complaints which, as the ALJ explained when formulating the RFC, were not sufficiently supported by substantial evidence. (Tr. at 62-63.) In particular, the ALJ noted that Plaintiff's claimed complete inability to see, rendering her unable to perform any jobs, was not supported by the objective record, including Plaintiff's "general presentation on exam, her field of vision, visual acuity, mild spasms, or incompletely treated ptosis (without simple [eyelid] crutches)." (Tr. at 62.) The ALJ again emphasized that Plaintiff's symptoms, including the "headaches, and increased sensitivity to light, to the extent those are consistent and supported by the examining and treating evidence," and the less than 15 minutes a day in which Plaintiff experienced eye spasms, were all "[e]ffectively . . . controlled for by the extensive extra ten percent off-task finding in the residual functional capacity assigned. Ten percent of an eight-hour workday (480 minutes) is forty-eight minutes." (Tr. at 62.)

The vocational expert testified that most employers "will tolerate up to 10% off-task behavior." (Tr. at 94.) By describing this percentage as "extensive" and "easily" accounting for the potential and supported effects of Plaintiff's symptoms, the ALJ sufficiently explained that he included this number, the maximum possible, out of an abundance of caution. This

off-task time explicitly includes the 10-15 minutes per day that the ALJ accepted based on Plaintiff's testimony and the medical records regarding her eye spasms, plus some additional time given the random, episodic nature of the spasms and the additional related vision issues noted by Plaintiff. Thus, this case proves similar to Shaw, 2021 WL 3079905, at *9, in that the ALJ found that Plaintiff's symptoms caused some time off task, but not a disabling amount of time. Because the rationale behind this figure is clearly discernible from the ALJ's decision, the Court finds no basis for remand.

C. Third-party statements

Finally, Plaintiff contends that the ALJ discounted the third-party statements provided by Plaintiff's mother, Virginia Smith, for "invalid reasons." (Pl.'s Br. at 15-18.) In particular, Plaintiff cites two out-of-Circuit cases, Garcia v. Colvin, 741 F.3d 758, 761 (7th Cir. 2013) and Regennitter v. Comm's of Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999), for the proposition that it is improper to reject opinions from non-medical sources "because of the possibility of bias amongst family members or because the third party does not have medical training." (Pl.'s Br. at 15, 17.) While it is true that an ALJ may not reject third-party testimony on these bases alone, both of the cases cited by Plaintiff, along with other case law along these lines, further explain that an ALJ may reject such statements by providing additional, more specific reasons. See, e.g., Garcia 741 F.3d at 761 (explaining that the ALJ "should have made clear whether he believed the fiancée's testimony or not, or which part he believed, or whether he had no idea how much of what she said was worthy of belief").

In the present case, the ALJ's decision included a lengthy description of Ms. Smith's statements and a detailed rationale for rejecting them to the same extent as Plaintiff's own

16

subjective reports. The ALJ first summarized Ms. Smith's two third-party statements as follows:

> First writing in April 2022, [Ms. Smith] shared that she had become [Plaintiff's] aide when going out in public and running errands. She drove her and kept close to her when walking to avoid any hazards. [Plaintiff] reportedly kept her eyes closed in public as much as she could. [Plaintiff] was still, to [her mother's] knowledge, able to care for herself, prepare simple meals, do chores, and plant flowers. This was the same language [Plaintiff] used in describing herself at the time. . . . Writing again in September 2023, [Ms. Smith] described [Plaintiff] in overwhelmingly more limiting terms. She recalled [Plaintiff's] history as an active and hard worker. She described how much [Plaintiff's] life had changed once her impairment appeared. She concluded [that Plaintiff] could not "work a job." She alleged secondary mental effects such as anxiety and depression. She reemphasized [Plaintiff's] inability to tolerate even modestly bright environments. She described the careful way [Plaintiff] stayed in the darker areas of her home.

(Tr. at 59.) Notably, the ALJ considered Ms. Smith's statements in an effort "[t]o better understand the intensity, persistence, and limiting effects of [Plaintiff's] alleged symptoms." (Tr. at 59.) However, the ALJ ultimately concluded that Ms. Smith's reports were "anecdotal and largely a mirror of [Plaintiff's] subjective statements rather than an analytic documentation of [Plaintiff's] objective presentation over time and in response to an ongoing treatment plan." (Tr. at 59.) In making this finding, the ALJ implicitly adopted the same rationale he provided for finding Plaintiff's own statements less-than-fully credible regarding the extent of her symptoms and limitations. As noted above in subsection A of this Opinion, Plaintiff does not challenge the ALJ's findings regarding her own subjective statements. The ALJ further explained that, while Ms. Smith's statements "describe some observed behaviors," the statements "lack clarity as to the frequency and controllability of such behaviors." (Tr. at 59.) Accordingly, Ms. Smith's observations "lack[] the longitudinal rigor" provided by the opinions of the state agency consultants, other consulting examiners, and the treating medical sources.

17

(Tr. at 59.) In addition to the "persuasive elements of the opinion evidence," the ALJ concluded that Plaintiff's RFC was "best supported by her collective vision exams and testing from the consulting examiner, her neurologist, and her ophthalmologists." (Tr. at 59.) As noted above, none of Plaintiff's providers or other sources noted any of the "unique behaviors" alleged by Plaintiff and her mother. The ALJ also relied on Plaintiff's "relatively stable treatment plans, partial relief with Botox, improved functioning with sunglasses," "Dr. Anderson's gauging of [Plaintiff's] response to care," and Plaintiff's "admitted capacity for various activities of daily living" when assessing the persuasiveness of Ms. Smith's statements and Plaintiff's overall RFC. (Tr. at 59.) Accordingly, the Court concludes that the ALJ's assessment of Ms. Smith's statements was both supported by substantial evidence and adequately explained in the ALJ's decision.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #8] is DENIED, that Defendant's Dispositive Brief [Doc. #10] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 30th day of September, 2025.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge